UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HMONG I, a fictitious name, on behalf of herself and as representative of members of a class of similarly situated claimants,<br><br>Plaintiff,<br><br>v.<br><br>LAO PEOPLE'S DEMOCRATIC REPUBLIC; et al.,<br><br>Defendants. | No. 2:15-cv-2349 TLN AC<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

Plaintiff has moved for entry of default judgments. ECF Nos. 7, 11, 19, 22. This matter was accordingly referred to the undersigned by E.D. Cal. R. ("Local Rule") 302(c)(19). For the reasons that follow, the undersigned will recommend that no default judgments be entered, and that the district court issue an Order to Show Cause why this complaint should not be dismissed for lack of federal jurisdiction.[1]

I. BACKGROUND / COMPLAINT

This lawsuit was filed by "Hmong I," alleged to be a fictitiously named real person.

---

[1] After the hearing on the motion, plaintiff submitted over 580 pages of exhibits and unsworn statements, and requested that the court consider them in support of her motion. ECF Nos. 28, 29. For the reasons that follow, the undersigned will deny the requests to consider those statements and documents.

1

Complaint ¶ 6. Hmong I "resides in an unspecified location in Southeast Asia." Id. ¶ 21. Plaintiff's husband was killed as part of "the official campaign in Laos to terminate Hmong people." Id. ¶¶ 19, 55. She sues under the Alien Tort Statute (the "Act" or "ATS"), 28 U.S.C. § 1350, for the wrongful death of her husband, and seeks an injunction to, among other things, "allow the Hmong people to reside in Laos in peace." Id. ¶¶ 70, 78.

Although plaintiff alleges that she sues "on behalf of herself and as representative of members of a class of similarly situated claimants," she has not moved to certify a class, which would be required if this action were to proceed as a class action. See Fed. R. Civ. P. ("Rule") 23 (parties may sue as "representative parties" of a class only if the requirements of Rule 23(a)(1)-(4) are satisfied).[2] At oral argument, counsel for plaintiff acknowledged that plaintiff had not moved for class certification and moreover, that plaintiff was proceeding at this point only on behalf of herself, Hmong I. Counsel asserted that plaintiff would consider the Rule 23 issues after the motion for default judgment had been resolved with regard to Hmong I. Accordingly, the undersigned does not here consider any issues regarding class representation or Rule 23. Such matters, in any event, have not been referred to the magistrate judge.

Plaintiff sues the country of Laos, its sitting President and Prime Minister, the Ministers of Defense, Justice and Public Security, and "General Bounchanh." Complaint ¶¶ 24-35. The complaint alleges that defendants engaged in a campaign of atrocities (including murder, torture, rape, maiming and poisoning and destroying "the jungle/their environment") against a group of Hmong people in Laos, after the Vietnam War. Complaint ¶¶ 3, 56. This campaign was intended to achieve the extermination of those among the Hmong people who had joined, or who had some connection with, the "Secret Army." Complaint ¶¶ 4, 35, 56, 58, 59, 64. The Secret Army is alleged to be a group of Hmong whom the "USA/CIA" recruited, during the Vietnam War from 1960-75, to fight the Pathet Lao and the Vietcong in Laos and Vietnam, and "to rescue US

---

[2] See also, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) ("The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23") (citations and internal question marks omitted).

soldiers that were in the Laotian/Vietnam border area." Complaint ¶¶ 57-59.

The complaint alleges that defendants' conduct was undertaken in violation of "international law," and in violation of following treaties: the 1962 Geneva Convention; the 1966 International Covenant on Civil and Political Rights; and the 1973 Vientiane Ceasefire Agreement. Complaint ¶¶ 15, 16, 39, 45-47, 48, 49; see also Complaint ¶ 78 (requesting injunction requiring defendants to abide by the cited treaties). The complaint also alleges that defendants' conduct violated various Laotian laws ("Decree[s] of the President of the Lao People's Democratic Republic on the Promulgation of the Penal Law"). See Complaint ¶¶ 51-54.

## II. DEFAULT JUDGMENT STANDARDS

A motion for entry of a default judgment involves "the two-step process" set out by Rule 55. Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir. 1986) (citing 6 Moore's Federal Practice ¶ 55.02[3], at 55-8). The first step is for plaintiff to ask the Clerk of the Court to enter a default. Rule 55(a). The Clerk must enter the default if plaintiff makes a showing "by affidavit or otherwise," that the "party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Id. For reasons that plaintiff failed to explain in her motion or at oral argument, she never took this first step.

Skipping instead to the second step, plaintiff now moves the court for the entry of a default *judgment* under Rule 55(b)(2). However, even if plaintiff had taken the first step and obtained entry of a default, that would not automatically entitle her to a court-ordered default judgment, since the decision to grant or deny an application for default judgment lies within the district court's sound discretion. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).

In making this determination, the court may consider the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. Eitel, 782 F.2d at 1471-72.

////

III. ANALYSIS

An analysis of the Eitel factors, as set forth below, shows that plaintiff is not entitled to a default judgment. The undersigned accordingly does not address the issues involved in determining whether plaintiff has achieved proper service on the sovereign nation of Laos, its sitting head of state, its sitting head of government, several of its sitting government ministers, and a general. See 28 U.S.C. § 1608(a) (specifying manner of service upon a foreign state); cf. Autotech Techs. LP v. Integral Research & Dev. Corp., 499 F.3d 737, 748 (7th Cir. 2007) ("In fact, service through an embassy is expressly banned both by an international treaty to which the United States is a party and by U.S. statutory law. The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, prohibits service on a diplomatic officer."), cert. denied, 552 U.S. 1231 (2008).

As further discussed below, the undersigned finds that this case is not within the jurisdiction of the district court. Thus, even if service has been properly effected, no default judgment could be entered. Moreover, if service was not properly effected, it would be futile for plaintiff to attempt proper service of a complaint that is not within the jurisdiction of this court. For the same reason, the undersigned does not recommend ordering plaintiff to engage in the futile act of obtaining an entry of default from the Clerk of the Court.

A. Prejudice, Material Disputes, Excusable Neglect

Plaintiff has not mentioned or addressed any of the Eitel factors in requesting a default judgment. Accordingly, the undersigned cannot determine whether plaintiff would be prejudiced if the court declines to enter a default judgment. Moreover, since the defendants have not appeared, the undersigned cannot determine whether they would dispute material facts of the complaint, nor whether their failure to appear is the result of excusable neglect (even assuming they had been properly served).

B. Amount in Controversy and the Policy Favoring Decisions on the Merits

Plaintiff seeks a judgment "in excess of $5 million." Complaint ¶ 69. This large amount tends to disfavor a default judgment. See Eitel, 782 at 1472 ("because Eitel was seeking almost $3 million in damages from McCool and because the parties disputed material facts in the

pleadings, we cannot say that the district court abused its discretion in denying the default judgment").

As for the policy favoring decisions on the merits, the analysis starts with "the general rule that default judgments are ordinarily disfavored," and that "[c]ases should be decided upon their merits whenever reasonably possible." Eitel, 782 F.2d at 1472.  That rule is particularly weighty here, where default judgments are sought against a foreign nation, its sitting head of state, its sitting head of government, and several of its government ministers.  See Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1551 (D.C. Cir. 1987) (Ginsburg, Cir. Judge) ("[i]ntolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations").

### C. The Merits and Sufficiency of the Complaint

Examination of the second and third Eitel factors -- the merits of plaintiff's claims and the sufficiency of the complaint -- establish that no default judgment is warranted here.  Where the complaint lacks merit, it is well within the court's discretion to deny a default judgment on that ground alone.  Aldabe, 616 F.2d at 1092-93 ("[g]iven the lack of merit in appellant's substantive claims, we cannot say that the district court abused its discretion in declining to enter a default judgment").  In this case, to say that the complaint "lacks merit" is not to say that plaintiff's allegations of atrocities are untrue or unsubstantiated, it is to say that those allegations do not appear to confer jurisdiction on this court or entitle plaintiff to obtain the relief she seeks by way of litigation.

In her motion, arguments at hearing, and post-hearing submissions, plaintiff seeks to present evidence of the alleged treaty violations and human rights abuses committed against members of the putative class.  The undersigned rejects these requests.[3]  Where the complaint

---

[3] "Whether to receive evidence going to liability on a default judgment motion is within the discretion of the court.  See Fed. R. Civ. P. 55(b)(2)(C); Parker W. Int'l, LLC v. Clean Up Am., Inc., 2009 WL 2916664 at *4, 2009 U.S. Dist. LEXIS 86346 at *7 (N.D. Cal. Sept. 1, 2009) (the court "retains the authority to require a plaintiff to 'establish the truth of any allegation by evidence'").  However, such evidence is taken to allow plaintiff to prove an allegation actually contained in the complaint; the evidence is not a substitute for missing allegations.  See Fed. R. (continued…)

5

fails to support jurisdiction, the court lacks the authority to entertain evidence.  This court's jurisdiction turns not on proof of treaty violations and human rights abuses, but on the provisions of the Alien Tort Statute as interpreted by the United States Supreme Court and the Ninth Circuit.  The undersigned accordingly turns to that issue.

### 1. Jurisdiction to consider this case

The Alien Tort Statute provides:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States

28 U.S.C. § 1350; see also 28 U.S.C. § 1330 ("[t]he district courts shall have original jurisdiction . . . against a foreign state . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity").  "[T]he ATS is a jurisdictional statute creating no new causes of action."  Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004).  However, "[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action . . . ."  Id. at 724.

It is clear in this Circuit that, in general, a cause of action will lie under the Act when an alien sues for violations of international law.  Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1018 (9th Cir. 2014) ("under Sosa, the federal courts are available to hear tort claims based on violations of international law"), cert. denied, 136 S. Ct. 798 (2016).  However, because all the conduct alleged in the complaint takes place wholly within the territory of Laos,[4] the court must first address the question of whether the statute that confers subject matter jurisdiction upon this court, 28 U.S.C. § 1350, reaches claims for conduct that occurs entirely outside of the United

---

Civ. P. 55(b)(2)(C) ("[t]he court may conduct hearings . . . to . . . *establish the truth of any allegation by evidence*") (emphasis added); Bd. of Trustees of Pipe Trades Dist. Council No. 36 Health & Welfare Trust Fund v. Clifton Enterprises, Inc., 2013 WL 2403573 at *8, 2013 U.S. Dist. LEXIS 77068 at *26 (N.D. Cal. May 31, 2013) ("while CRB's liability is not established through its default [because the allegations were legal conclusions], the Court may accept affidavits and other evidence to establish the truth of Plaintiffs' allegations").

[4] The undersigned briefly discusses below the argument that plaintiff's counsel asserted for the first time at oral argument, namely, that conduct underlying plaintiff's claim did occur in the United States.

6

States, and wholly within the territory of a foreign nation.

In Kiobel v. Royal Dutch Petroleum Co., plaintiffs were "Nigerian nationals residing in the United States." 133 S. Ct. 1659, 1662 (2013). They filed suit under the Alien Tort Statute, alleging that defendant Dutch, British, and Nigerian corporations "aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria." Id. The question presented to the Court was "whether and under what circumstances courts may recognize a cause of action under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States." Id. at 1662.

The Court concluded that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." Id. at 1669. The presumption arises from a canon of statutory construction that reflects "the 'presumption that United States law governs domestically but does not rule the world.'" Id. at 1664 (quoting Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454 (2007)). Because there is no indication that Congress intended this Act to apply to conduct occurring entirely in another country, the Court held that "petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred." Id. at 1669. Despite its broad language, however, Kiobel also indicated that extraterritorial claims could be asserted "where the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Id. at 1669.

In Doe I, the lawsuit was brought by three Malian "former child slaves who were forced to harvest cocoa in the Ivory Coast." 766 F.3d at 1016, 1027. On appeal to the Ninth Circuit, the defendants argued that the action was properly dismissed because "the plaintiffs' complaint improperly seeks extraterritorial application of federal law contrary to the Supreme Court's recent decision" in Kiobel. Doe I, 766 F.3d at 1020. The Ninth Circuit reversed the dismissal, and remanded to the district court so that plaintiffs could attempt to amend their complaint in light of the "touch and concern" language of Kiobel. Id. at 1027 (in Kiobel, the Court articulated "a new 'touch and concern' test for determining when it is permissible" for a claim under the Act to seek the extraterritorial application of federal law").

This case falls squarely within Kiobel, as all the conduct alleged in the complaint occurred in Laos. Moreover, the complaint does not allege any facts that might bring it within the "touch and concern" language of Kiobel and Doe I. There is no allegation that the plaintiff or any defendant has any connection with the United States (except that, by implication, plaintiff or her late husband had some connection with the Secret Army in Laos). For example, there is no allegation that any defendant fled, or otherwise travelled, to this country. All the conduct set forth in the complaint is alleged to have occurred, and to be occurring, within the territory of Laos. The complaint contains no allegation of any conduct occurring in the United States, having any effect in this country, or being directed at, or affecting, anyone in or from the United States.

This recitation is not intended to imply that the existence of any one or group of these contacts would be sufficient to permit this action to go forward. However, the *absence* of any possible connection to this country places the case squarely within the bar of Kiobel. Indeed, a principal goal of the lawsuit is to enable the Hmong people to live in peace *in Laos*:

> Plaintiff requests injunctive relief in the form of preliminary or permanent injunction requiring Defendants to cease their illegal campaign of atrocities against Hmong people in Laos; to require an appropriate investigation into all these atrocities; to require Laotian government officials to take affirmative steps to declare this campaign as over, and to allow the Hmong people to reside in Laos in peace . . ..

Complaint ¶ 78.

Plaintiff does not cite or address Kiobel or (Doe I) in her motion for default judgment, and at oral argument, counsel informed the court that he was not prepared to address it. Instead counsel insisted that the action was governed by Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.), 978 F.2d 493 (9th Cir. 1992) ("Marcos"), cert. denied, 508 U.S. 972 (1993), and the district court cases plaintiff cited in her motion, all of which pre-date Kiobel. Counsel did not respond to the undersigned's question about the effect Kiobel may have had on Marcos.

In Marcos, the plaintiff's son was kidnapped, interrogated, tortured and murdered in the Philippines by Philippine military intelligence personnel who were acting under defendant's

////

direction. Marcos, 978 F.2d at 495-96.[5] In analyzing the Alien Tort Statute, the Ninth Circuit stated that to state a claim under the Act required only "an alien, a tort, and a violation of international law." Id. at 499. The court went on to reject the argument "that the district court erred in assuming jurisdiction of a tort committed by a foreign state's agents against its nationals outside of the United States, and having no nexus to this country." Id. at 499. It is difficult to see how Marcos and Kiobel could be reconciled, when Kiobel held that "petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred," at least where the claims do not "touch and concern" the United States. Kiobel, 133 S. Ct. at 1669.[6]

Moreover, another Ninth Circuit case further weakens the argument that Marcos governs this case, in which there is "no nexus" to the United States. In Sarei v. Rio Tinto PLC., 221 F. Supp. 2d 1116 (C.D. Cal. 2002),[7] plaintiffs were "current and former residents of the island of Bougainville in Papua New Guinea." They filed a putative class action under the Alien Tort Statute, alleging that "defendants' mining operations on Bougainville destroyed the island's environment, harmed the health of its people, and incited a ten-year civil war, during which thousands of civilians died or were injured." On appeal, the Ninth Circuit relied heavily upon Marcos, stating:

> Our circuit has addressed this same issue once before. In In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos I), 978 F.2d 493, 499-501 (9th Cir. 1992), we considered an ATS claim

---

[5] Defendant was the daughter of the former President of the Philippines, Ferdinand Marcos. The Ninth Circuit denied defendant's assertion of immunity under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, on the ground that she "admitted acting on her own authority, not on the authority of the Republic of the Philippines." Marcos, 978 F.2d at 496.

[6] The undersigned notes that despite the broad implication in Marcos that there is no need for a "nexus to this country" in claims under the Act, such a nexus did in fact exist in that case, because defendant had fled to the United States. The question of whether this fact would be sufficient to establish that the Marcos claims "touch and concern" the United States is not clear. However, that fact would certainly meet that standard under the test used by the concurring Justices in Kiobel, who wrote that the federal courts have jurisdiction under the Act where "(1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, *and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind*." Kiobel, 133 S. Ct. at 1671 (Breyer, concurring) (emphasis added).

[7] Aff'd in part, rev'd and remanded in part, 671 F.3d 736 (9th Cir. 2011) (en banc), vacated, 133 S. Ct. 1995 (2013).

>    based on torture that took place in the Philippines. *We categorically rejected the argument that the ATS applies only to torts committed in this country.* We said, "we are constrained by what § 1350 shows on its face: *no limitations as to the citizenship of the defendant, or the locus of the injury.*" Id. at 500.

Sarei v. Rio Tinto, PLC, 671 F.3d 736, 744-45 (9th Cir. 2011) (en banc) (emphasis added).[8] The court noted that "[a]lthough the torts alleged all occurred outside of the United States, Rio Tinto has substantial operations in this country," and went on to hold that "[t]here is no extraterritorial bar to applying the ATS to the conduct alleged in this case." Id. at 747.

The Supreme Court vacated the decision in Sarei, and remanded "for further consideration in light of Kiobel v. Royal Dutch Petroleum Co., 569 U.S. ___, 133 S. Ct. 1659 (2013)." Rio Tinto, PLC v. Sarei, 133 S. Ct. 1995 (2013). On remand, the Ninth Circuit "voted to affirm the district court's judgment of dismissal with prejudice." Sarei v. Rio Tinto, PLC, 722 F.3d 1109, 1110 (9th Cir. 2013) (en banc). Thus, it is even more difficult to view Marcos as stating the applicable law regarding the extraterritorial reach of the Act, where, as here, there is "no nexus" of any kind to the United States.

In light of Kiobel, Doe I, and Sarei, the complaint fails to establish that this court can exercise jurisdiction over this case, since it alleges *no conduct* that could be said to "touch and concern" the United States, no matter how that phrase is interpreted, and even if it is assumed that Marcos is still good law.[9] The remaining cases cited by plaintiff also predate Kiobel, Doe I and Sarei, and in addition, some or all involve cases were there was *some* connection to the United States. See, e.g., Doe v. Saravia, 348 F. Supp. 2d 1112, 1118 (E.D. Cal. 2004) ("*Saravia was resident in Modesto, California*, in the Fresno Division of the Eastern Judicial District of California at the time this suit was filed") (emphasis added); Letelier v. Republic of Chile, 502 F. Supp. 259, 260 (D.D.C. 1980) (a case involving "the bombing deaths of former Chilean ambassador Letelier and Ronni Moffitt in September 1976 *in Washington, D.C.*") (emphasis

---

[8] Vacated, 133 S. Ct. 1995 (2013).
[9] The undersigned expresses no view on whether Marcos would be decided the same way today, given that there was, in fact, a critical nexus to this country in that case, namely, the defendant had fled to this country. However, Marcos does not mention this nexus in reaching its conclusion that the ATS reached conduct occurring entirely in the Philippines.

added); Filartiga v. Pena-Irala, 577 F. Supp. 860 (E.D.N.Y. 1984) (involving a lawsuit brought by plaintiffs "who had applied for permanent political asylum in the United States," against a defendant "*who was in United States on a visitor's visa*") (emphasis added).

At oral argument, plaintiff's counsel asserted for the first time that all the conduct alleged in the complaint occurred because of the breach of an "oral treaty," and that this breach occurred in the United States.[10] According to counsel, an unidentified President of the United States (since identified in a post-hearing submission as Dwight D. Eisenhower, see ECF No. 28 at 2), entered into an "oral treaty" with the "King of Laos." Under this treaty, the Hmong people would assist the United States in fighting the Pathet Lao, and the United States would protect the Hmong after the war. However, counsel asserted, the United States had no intention of honoring the treaty, even at the moment that agreement was reached. In addition, according to counsel, the United States left behind weapons that were then used by Laos in the atrocities against the Hmong people. It is not at all clear that such allegations, even if they appeared in the complaint, would suffice to allow this court to exercise jurisdiction over this case. However, since these allegations do not even appear in the complaint, they cannot be used to justify the entry of a default judgment.

Plaintiff has now submitted two Requests for Leave to file further statements and evidence, totaling over 580 pages,[11] in a belated attempt to show that the claim has some connection to the United States. See ECF Nos. 28, 29. As noted above, even if the submitted documents and additional statements would show that the claims are sufficiently connected to the United States, no default judgment is warranted at this time because none of this information is in the complaint. Under Eitel, the court looks exclusively to the sufficiency of the *complaint*. See also Cripps v. Life Ins. Co. of North America, 980 F.2d 1261, 1267 (9th Cir. 1992) ("necessary

---

[10] Counsel did not explain what an "oral treaty" is, or whether it is the type of "treaty" that is referred to in the ATS.

[11] The exhibits consist of the following unauthenticated and unexplained documents: newspaper articles; pages from treaties, conventions, agreements and resolutions; Congressional testimony; photographs; reports on gold reserves; investor forms; analyses of financial statistics; graphs; Laotian military orders; maps; and foreign language documents.

11

1   facts not contained in the pleadings . . . are not established by default."). It is well established

2   that "[a] plaintiff suing in federal court must show *in his pleading*, affirmatively and distinctly,

3   the existence of whatever is essential to federal jurisdiction [. . .]." Smith v. McCullough, 270

4   U.S. 456, 459 (1926) (emphasis added). This court is not called upon to pore through hundreds of

5   pages of documents submitted after it becomes clear that the *complaint* is insufficient to state a

6   claim or establish federal jurisdiction.

7       In summary, the complaint does not support default judgment against any defendant.

8   Indeed, Kiobel compels the conclusion that the court cannot exercise jurisdiction over this claim.

9   That is sufficient grounds for the court to issue an order to show cause why the entire case should

10  not be dismissed for lack of federal jurisdiction.

11                  2.   Immunity – People's Democratic Republic of Laos

12      A foreign state is immune from suit except as specified in the Foreign Sovereign

13  Immunity Act ("FSIA"). 28 U.S.C. § 1604 ("a foreign state shall be immune from the

14  jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607 of

15  this chapter); Cassirer v. Kingdom of Spain, 616 F.3d 1019, 1026-27 (9th Cir. 2010), cert. denied,

16  131 S. Ct. 3057 (2011). Indeed, the FSIA is "the sole basis for obtaining jurisdiction over a

17  foreign state in our courts." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428,

18  434 (1989); Samantar v. Yousuf, 560 U.S. 305, 313 (2010) ("[a]fter the enactment of the FSIA,

19  the Act – and not the pre-existing common law – indisputably governs the determination of

20  whether a foreign state is entitled to sovereign immunity"). Moreover, "the FSIA 'must be

21  applied by the district courts in every action against a foreign sovereign, since subject-matter

22  jurisdiction in any such action depends on the existence of one of the specified exceptions to

23  foreign sovereign immunity.'" Amerada Hess, 488 U.S. at 434-35 (quoting Verlinden B.V. v.

24  Central Bank of Nigeria, 461 U.S. 480 (1983)).

25      The exceptions to this jurisdictional immunity are,

26          [1]cases involving the waiver of immunity, [2] commercial
    activities occurring in the United States or causing a direct effect in
27          this country, [3] property expropriated in violation of international
    law, [4] inherited, gift, or immovable property located in the United
28

States, [5] non-commercial torts occurring in the United States, and
[6] maritime liens.

Amerada Hess, 488 U.S. at 439 (citations omitted, citing 28 U.S.C. § 1605(a), (b)).

None of the above exceptions to the FSIA are alleged in the complaint, none were asserted in the motion for default judgment, and none were mentioned at the hearing on this matter. Accordingly, the court lacks the authority to enter a default judgment here.  Indeed, since the immunity is jurisdictional, the court cannot even exercise jurisdiction over the claim against Laos. That is sufficient grounds for the issuance of an order to show cause why the claim against Laos should not be dismissed for lack of jurisdiction.

### 3. Immunity – The President and Prime Minister of Laos

While the FSIA now governs the immunity of sovereign states, its enactment (in 1972) had no effect on the immunity of individual government officials.  Samantar, 560 U.S. at 308 (regarding a suit against petitioner, the former Prime Minister of Somalia, the Court held that "the FSIA does not govern the determination of petitioner's immunity from suit").

Before the FSIA was enacted, the district court was obliged to dismiss a suit against a foreign state for lack of jurisdiction, if the State Department filed a "Suggestion of Immunity" on behalf of that country.  See Peterson v. Islamic Republic Of Iran, 627 F.3d 1117, 1126 (9th Cir. 2010) (if the State Department filed "a formal suggestion of immunity with the court on behalf of the foreign state . . . the district court dismissed the case for lack of jurisdiction"). While such Suggestions are no longer binding on the court when filed on behalf of a foreign state (because of FSIA), there is "no reason to believe that Congress saw as a problem, or wanted to eliminate, the State Department's role in determinations regarding individual official immunity." Samantar, 560 U.S. at 323.

The U.S. has filed a "Suggestion of Immunity" in this case on behalf of the President and Prime Minister of Laos.  ECF No. 23.  Plaintiff has not responded to the Suggestion of Immunity, and did not argue that it was not binding on the court at the hearing on this matter.  Accordingly, no default judgment can be entered against the President or Prime Minister of Laos, and the Suggestion is grounds for the court to issue an order to show cause why the case against the

President and Prime Minister should not be dismissed for lack of federal jurisdiction.

## III.  CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that plaintiff's Requests for Leave To File additional materials (ECF Nos. 28, 29) are DENIED.

Furthermore, IT IS HEREBY RECOMMENDED that:

1.  Plaintiff's motion for default judgment (ECF No. 19), should be DENIED in its entirety; and

2.  Plaintiff should be Ordered to Show Cause why this entire action should not be dismissed for lack of federal jurisdiction.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Id.; see also Local Rule 304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections.  Local Rule 304(d).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: March 11, 2016

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE