1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    HMONG I, a fictitious name, on behalf of          No.  2:15-cv-2349 TLN AC
      herself and as representative of members of
12    a class of similarly situated claimants,

13              Plaintiff,                               ORDER AND AMENDED FINDINGS AND
                                                         RECOMMENDATIONS
14       v.

15    LAO PEOPLE'S DEMOCRATIC
      REPUBLIC; et al.,
16
                Defendants.
17

18

19          Plaintiff has moved for entry of default judgments.  ECF Nos. 7, 11, 19, 22.  This matter

20    was accordingly referred to the undersigned by E.D. Cal. R. ("Local Rule") 302(c)(19).  On

21    March 14, 2016, the undersigned issued Findings and Recommendations.  ECF No. 30.  Plaintiff

22    filed objections pointing out that the Findings incorrectly stated that plaintiff had not responded to

23    the Suggestion of Immunity filed by the United States.  ECF No. 32.  In fact, plaintiff had

24    responded to the Suggestion of Immunity.  See ECF No. 24.  Accordingly, the Order and

25    Findings and Recommendations of March 14, 2016, will be vacated.

26    ////

27    ////

28    ////

1

For the reasons that follow, the undersigned will recommend that no default judgments be entered, and that the district court issue an Order to Show Cause why this lawsuit should not be dismissed.[1]

## I. BACKGROUND / COMPLAINT

This lawsuit was filed by "Hmong I," alleged to be a fictitiously named real person. Complaint ¶ 6. Hmong I "resides in an unspecified location in Southeast Asia." Id. ¶ 21. Plaintiff's husband was killed as part of "the official campaign in Laos to terminate Hmong people." Id. ¶¶ 19, 55. She sues under the Alien Tort Statute (the "Act" or "ATS"), 28 U.S.C. § 1350, for the wrongful death of her husband, and seeks an injunction to, among other things, "allow the Hmong people to reside in Laos in peace." Id. ¶¶ 70, 78.

Although plaintiff alleges that she sues "on behalf of herself and as representative of members of a class of similarly situated claimants," she has not moved to certify a class, which would be required if this action were to proceed as a class action. See Fed. R. Civ. P. ("Rule") 23 (parties may sue as "representative parties" of a class only if the requirements of Rule 23(a)(1)-(4) are satisfied).[2] At oral argument, counsel for plaintiff acknowledged that plaintiff had not moved for class certification and moreover, that plaintiff was proceeding at this point only on behalf of herself, Hmong I. Counsel asserted that plaintiff would consider the Rule 23 issues after the motion for default judgment had been resolved with regard to Hmong I. Accordingly, the undersigned does not here consider any issues regarding class representation or Rule 23. Such matters, in any event, have not been referred to the magistrate judge.

Plaintiff sues the country of Laos, its sitting President and Prime Minister, the Ministers of Defense, Justice and Public Security, and "General Bounchanh." Complaint ¶¶ 24-35. The

---

[1] After the hearing on the motion, plaintiff submitted over 580 pages of exhibits and unsworn statements, and requested that the court consider them in support of her motion. ECF Nos. 28, 29. For the reasons that follow, the undersigned will deny the requests to consider those statements and documents.

[2] See also, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) ("The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23") (citations and internal question marks omitted).

1   complaint alleges that defendants engaged in a campaign of atrocities (including murder, torture,

2   rape, maiming and poisoning and destroying "the jungle/their environment") against a group of

3   Hmong people in Laos, after the Vietnam War.  Complaint ¶¶ 3, 56.  This campaign was intended

4   to achieve the extermination of those among the Hmong people who had joined, or who had some

5   connection with, the "Secret Army."  Complaint ¶¶ 4, 35, 56, 58, 59, 64.  The Secret Army is

6   alleged to be a group of Hmong whom the "USA/CIA" recruited, during the Vietnam War from

7   1960-75, to fight the Pathet Lao and the Vietcong in Laos and Vietnam, and "to rescue US

8   soldiers that were in the Laotian/Vietnam border area."  Complaint ¶¶ 57-59.

9        The complaint alleges that defendants' conduct was undertaken in violation of

10   "international law," and in violation of following treaties: the 1962 Geneva Convention; the 1966

11   International Covenant on Civil and Political Rights; and the 1973 Vientiane Ceasefire

12   Agreement.  Complaint ¶¶ 15, 16, 39, 45-47, 48, 49; see also Complaint ¶ 78 (requesting

13   injunction requiring defendants to abide by the cited treaties).  The complaint also alleges that

14   defendants' conduct violated various Laotian laws ("Decree[s] of the President of the Lao

15   People's Democratic Republic on the Promulgation of the Penal Law").  See Complaint ¶¶ 51-54.

16                 II.  DEFAULT JUDGMENT STANDARDS

17        A motion for entry of a default judgment involves "the two-step process" set out by

18   Rule 55.  Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir. 1986) (citing 6 Moore's Federal Practice

19   ¶ 55.02[3], at 55-8).  The first step is for plaintiff to ask the Clerk of the Court to enter a default.

20   Rule 55(a).  The Clerk must enter the default if plaintiff makes a showing "by affidavit or

21   otherwise," that the "party against whom a judgment for affirmative relief is sought has failed to

22   plead or otherwise defend."  Id.  For reasons that plaintiff failed to explain in her motion or at oral

23   argument, she never took this first step.

24        Skipping instead to the second step, plaintiff now moves the court for the entry of a

25   default judgment under Rule 55(b)(2).  However, even if plaintiff had taken the first step and

26   obtained entry of a default, that would not automatically entitle her to a court-ordered default

27   judgment, since the decision to grant or deny an application for default judgment lies within the

28   district court's sound discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).

1    In making this determination, the court may consider the following factors: (1) the

2  possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the

3  sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a

4  dispute concerning material facts; (6) whether the default was due to excusable neglect; and

5  (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the

6  merits.  <u>Eitel</u>, 782 F.2d at 1471-72.

7                                         III.  ANALYSIS

8    An analysis of the <u>Eitel</u> factors, as set forth below, shows that plaintiff is not entitled to a

9  default judgment.  The undersigned accordingly does not address the issues involved in

10  determining whether plaintiff has achieved proper service on the sovereign nation of Laos, its

11  sitting head of state, its sitting head of government, several of its sitting government ministers,

12  and a general.  <u>See</u> 28 U.S.C. § 1608(a) (specifying manner of service upon a foreign state); <u>cf.</u>

13  <u>Autotech Techs. LP v. Integral Research & Dev. Corp.</u>, 499 F.3d 737, 748 (7th Cir. 2007) ("In

14  fact, service through an embassy is expressly banned both by an international treaty to which the

15  United States is a party and by U.S. statutory law.  The Vienna Convention on Diplomatic

16  Relations, Apr. 18, 1961, 23 U.S.T. 3227, prohibits service on a diplomatic officer."), <u>cert.</u>

17  <u>denied</u>, 552 U.S. 1231 (2008).

18    As further discussed below, the undersigned finds that this case is not within the

19  jurisdiction of the district court.  Thus, even if service has been properly effected, no default

20  judgment could be entered.  Moreover, if service was not properly effected, it would be futile for

21  plaintiff to attempt proper service of a complaint that is not within the jurisdiction of this court.

22  For the same reason, the undersigned does not recommend ordering plaintiff to engage in the

23  futile act of obtaining an entry of default from the Clerk of the Court.

24    A.  <u>Prejudice, Material Disputes, Excusable Neglect</u>

25    Plaintiff has not mentioned or addressed any of the <u>Eitel</u> factors in requesting a default

26  judgment.  Accordingly, the undersigned cannot determine whether plaintiff would be prejudiced

27  if the court declines to enter a default judgment.  Moreover, since the defendants have not

28  appeared, the undersigned cannot determine whether they would dispute material facts of the

1  complaint, nor whether their failure to appear is the result of excusable neglect (even assuming

2  they had been properly served).

3        B.  Amount in Controversy and the Policy Favoring Decisions on the Merits

4        Plaintiff seeks a judgment "in excess of $5 million."  Complaint ¶ 69.  This large amount

5  tends to disfavor a default judgment.  See Eitel, 782 at 1472 ("because Eitel was seeking almost

6  $3 million in damages from McCool and because the parties disputed material facts in the

7  pleadings, we cannot say that the district court abused its discretion in denying the default

8  judgment").

9        As for the policy favoring decisions on the merits, the analysis starts with "the general

10  rule that default judgments are ordinarily disfavored," and that "[c]ases should be decided upon

11  their merits whenever reasonably possible."  Eitel, 782 F.2d at 1472.  That rule is particularly

12  weighty here, where default judgments are sought against a foreign nation, its sitting head of

13  state, its sitting head of government, and several of its government ministers.  See Practical

14  Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1551 (D.C. Cir. 1987) (Ginsburg,

15  Cir. Judge) ("[i]ntolerant adherence to default judgments against foreign states could adversely

16  affect this nation's relations with other nations").

17        C.  The Merits and Sufficiency of the Complaint

18        Examination of the second and third Eitel factors – the merits of plaintiff's claims and the

19  sufficiency of the complaint – establish that no default judgment is warranted here.  Where the

20  complaint lacks merit, it is well within the court's discretion to deny a default judgment on that

21  ground alone.  Aldabe, 616 F.2d at 1092-93 ("[g]iven the lack of merit in appellant's substantive

22  claims, we cannot say that the district court abused its discretion in declining to enter a default

23  judgment").  In this case, to say that the complaint "lacks merit" is not to say that plaintiff's

24  allegations of atrocities are untrue or unsubstantiated, it is to say that those allegations do not

25  appear to confer jurisdiction on this court or entitle plaintiff to obtain the relief she seeks by way

26  of litigation.

27        In her motion, arguments at hearing, and post-hearing submissions, plaintiff seeks to

28  present evidence of the alleged treaty violations and human rights abuses committed against

1   members of the putative class.  The undersigned is constrained to deny these requests.[3]  Where

2   the complaint fails to support jurisdiction, the court lacks the authority to entertain evidence.  This

3   court's jurisdiction turns not on proof of treaty violations and human rights abuses, but on the

4   provisions of the Alien Tort Statute as interpreted by the United States Supreme Court and the

5   Ninth Circuit.  The undersigned accordingly turns to that issue.

6              1.  Jurisdiction to consider this case

7         The Alien Tort Statute provides:

8              The district courts shall have original jurisdiction of any civil action
             by an alien for a tort only, committed in violation of the law of
9              nations or a treaty of the United States

10   28 U.S.C. § 1350; see also 28 U.S.C. § 1330 ("[t]he district courts shall have original jurisdiction

11   . . . against a foreign state . . as to any claim for relief in personam with respect to which the

12   foreign state is not entitled to immunity").  "[T]he ATS is a jurisdictional statute creating no new

13   causes of action."  Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004).  However, "[t]he

14   jurisdictional grant is best read as having been enacted on the understanding that the common law

15   would provide a cause of action . . .."  Id. at 724.

16         It is clear in this Circuit that, in general, a cause of action will lie under the Act when an

17   alien sues for violations of international law.  Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1018

18   (9th Cir. 2014) ("under Sosa, the federal courts are available to hear tort claims based on

19   violations of international law"), cert. denied, 136 S. Ct. 798 (2016).  However, because all the

20   conduct alleged in the complaint takes place wholly within the territory of Laos,[4] the court must

21

22   _____
    [3]  "Whether to receive evidence going to liability on a default judgment motion is within the
    discretion of the court.  See Fed. R. Civ. P. 55(b)(2)(C); Parker W. Int'l, LLC v. Clean Up Am.,
23   Inc., 2009 WL 2916664 at *4, 2009 U.S. Dist. LEXIS 86346 at *7 (N.D. Cal. Sept. 1, 2009) (the
    court "retains the authority to require a plaintiff to 'establish the truth of any allegation by
24   evidence'").  However, such evidence is taken to allow plaintiff to prove an allegation actually
    contained in the complaint; the evidence is not a substitute for missing allegations.  See Fed. R.
25   Civ. P. 55(b)(2)(C) ("[t]he court may conduct hearings . . . to . . . establish the truth of any
    allegation by evidence") (emphasis added); Bd. of Trustees of Pipe Trades Dist. Council No. 36
26   Health & Welfare Trust Fund v. Clifton Enterprises, Inc., 2013 WL 2403573 at *8, 2013 U.S.
    Dist. LEXIS 77068 at *26 (N.D. Cal. May 31, 2013) ("while CRB's liability is not established
27   through its default [because the allegations were legal conclusions], the Court may accept
    affidavits and other evidence to establish the truth of Plaintiffs' allegations").
    [4]  The undersigned briefly discusses below the argument that plaintiff's counsel asserted for the
28   (continued…)

1    first address the question of whether the statute that confers subject matter jurisdiction upon this

2    court, 28 U.S.C. § 1350, reaches claims for conduct that occurs entirely outside of the United

3    States, and wholly within the territory of a foreign nation.

4         In Kiobel v. Royal Dutch Petroleum Co., plaintiffs were "Nigerian nationals residing in

5    the United States."  133 S. Ct. 1659, 1662 (2013).  They filed suit under the Alien Tort Statute,

6    alleging that defendant Dutch, British, and Nigerian corporations "aided and abetted the Nigerian

7    Government in committing violations of the law of nations in Nigeria."  Id.  The question

8    presented to the Court was "whether and under what circumstances courts may recognize a cause

9    of action under the Alien Tort Statute, for violations of the law of nations occurring within the

10   territory of a sovereign other than the United States."  Id. at 1662.

11        The Court concluded that "the presumption against extraterritoriality applies to claims

12   under the ATS, and that nothing in the statute rebuts that presumption."  Id. at 1669.  The

13   presumption arises from a canon of statutory construction that reflects "the 'presumption that

14   United States law governs domestically but does not rule the world.'"  Id. at 1664 (quoting

15   Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454 (2007)).  Because there is no indication that

16   Congress intended this Act to apply to conduct occurring entirely in another country, the Court

17   held that "petitioners' case seeking relief for violations of the law of nations occurring outside the

18   United States is barred."  Id. at 1669.  Despite its broad language, however, Kiobel also indicated

19   that extraterritorial claims could be asserted "where the claims touch and concern the territory of

20   the United States . . . with sufficient force to displace the presumption against extraterritorial

21   application."  Id.  at 1669.

22        In Doe I, the lawsuit was brought by three Malian "former child slaves who were forced to

23   harvest cocoa in the Ivory Coast."  766 F.3d at 1016, 1027.  On appeal to the Ninth Circuit, the

24   defendants argued that the action was properly dismissed because "the plaintiffs' complaint

25   improperly seeks extraterritorial application of federal law contrary to the Supreme Court's recent

26

27   first time at oral argument, namely, that conduct underlying plaintiff's claim did occur in the
     United States.

28

7

decision" in Kiobel. Doe I, 766 F.3d at 1020. The Ninth Circuit reversed the dismissal, and remanded to the district court so that plaintiffs could attempt to amend their complaint in light of the "touch and concern" language of Kiobel. Id. at 1027 (in Kiobel, the Court articulated "a new 'touch and concern' test for determining when it is permissible" for a claim under the Act to seek the extraterritorial application of federal law").

This case falls squarely within Kiobel, as all the conduct alleged in the complaint occurred in Laos. Moreover, the complaint does not allege any facts that might bring it within the "touch and concern" language of Kiobel and Doe I. There is no allegation that the plaintiff or any defendant has any connection with the United States (except that, by implication, plaintiff or her late husband had some connection with the Secret Army in Laos). For example, there is no allegation that any defendant fled, or otherwise travelled, to this country. All the conduct set forth in the complaint is alleged to have occurred, and to be occurring, within the territory of Laos. The complaint contains no allegation of any conduct occurring in the United States, having any effect in this country, or being directed at, or affecting, anyone in or from the United States.

This recitation is not intended to imply that the existence of any one or group of these contacts would be sufficient to permit this action to go forward. However, the *absence* of any possible connection to this country places the case squarely within the bar of Kiobel. Indeed, a principal goal of the lawsuit is to enable the Hmong people to live in peace *in Laos*:

> Plaintiff requests injunctive relief in the form of preliminary or permanent injunction requiring Defendants to cease their illegal campaign of atrocities against Hmong people in Laos; to require an appropriate investigation into all these atrocities; to require Laotian government officials to take affirmative steps to declare this campaign as over, and to allow the Hmong people to reside in Laos in peace . . ..

Complaint ¶ 78.

Plaintiff does not cite or address Kiobel or (Doe I) in her motion for default judgment, and at oral argument, counsel informed the court that he was not prepared to address it. Instead counsel insisted that the action was governed by Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.), 978 F.2d 493 (9th Cir. 1992) ("Marcos"), cert. denied, 508 U.S. 972 (1993), and the district court cases plaintiff cited in her motion, all of which pre-date Kiobel.

8

1    Counsel did not respond to the undersigned's question about the effect <u>Kiobel</u> may have had on

2    <u>Marcos</u>.

3          In <u>Marcos</u>, the plaintiff's son was kidnapped, interrogated, tortured and murdered in the

4    Philippines by Philippine military intelligence personnel who were acting under defendant's

5    direction. <u>Marcos</u>, 978 F.2d at 495-96.[5]  In analyzing the Alien Tort Statute, the Ninth Circuit

6    stated that to state a claim under the Act required only "an alien, a tort, and a violation of

7    international law." <u>Id.</u> at 499.  The court went on to reject the argument "that the district court

8    erred in assuming jurisdiction of a tort committed by a foreign state's agents against its nationals

9    outside of the United States, and having no nexus to this country." <u>Id.</u> at 499.  It is difficult to see

10   how <u>Marcos</u> and <u>Kiobel</u> could be reconciled, when <u>Kiobel</u> held that "petitioners' case seeking

11   relief for violations of the law of nations occurring outside the United States is barred," at least

12   where the claims do not "touch and concern" the United States. <u>Kiobel</u>, 133 S. Ct. at  1669.[6]

13         Moreover, another Ninth Circuit case further weakens the argument that <u>Marcos</u> governs

14   this case, in which there is "no nexus" to the United States.  In <u>Sarei v. Rio Tinto PLC.</u>, 221 F.

15   Supp. 2d 1116 (C.D. Cal. 2002),[7] plaintiffs were "current and former residents of the island of

16   Bougainville in Papua New Guinea."  They filed a putative class action under the Alien Tort

17   Statute, alleging that "defendants' mining operations on Bougainville destroyed the island's

18   environment, harmed the health of its people, and incited a ten-year civil war, during which

19   _____

20   [5]  Defendant was the daughter of the former President of the Philippines, Ferdinand Marcos.  The
     Ninth Circuit denied defendant's assertion of immunity under the Foreign Sovereign Immunity

21   Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, on the ground that she "admitted acting on her own
     authority, not on the authority of the Republic of the Philippines." <u>Marcos</u>, 978 F.2d at 496.
     [6]  The undersigned notes that despite the broad implication in <u>Marcos</u> that there is no need for a

22   "nexus to this country" in claims under the Act, such a nexus did in fact exist in that case, because
     defendant had fled to the United States.  The question of whether this fact would be sufficient to

23   establish that the <u>Marcos</u> claims "touch and concern" the United States is not clear.  However,
     that fact would certainly meet that standard under the test used by the concurring Justices in

24   <u>Kiobel</u>, who wrote that the federal courts have jurisdiction under the Act where "(1) the alleged
     tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's

25   conduct substantially and adversely affects an important American national interest, *and that*
     *includes a distinct interest in preventing the United States from becoming a safe harbor (free of*

26   *civil as well as criminal liability) for a torturer or other common enemy of mankind.*" <u>Kiobel</u>,
     133 S. Ct. at 1671 (Breyer, concurring) (emphasis added).

27   [7]  <u>Aff'd in part, rev'd and remanded in part</u>, 671 F.3d 736 (9th Cir. 2011) (en banc), <u>vacated</u>, 133
     S. Ct. 1995 (2013).

28

                                                    9

1  thousands of civilians died or were injured."  On appeal, the Ninth Circuit relied heavily upon

2  Marcos, stating:

3          Our circuit has addressed this same issue before. In In re
           Estate of Ferdinand Marcos, Human Rights Litig. (Marcos I), 978
4          F.2d 493, 499-501 (9th Cir. 1992), we considered an ATS claim
           based on torture that took place in the Philippines.  *We*
5          *categorically rejected the argument that the ATS applies only to*
           *torts committed in this country*.  We said, "we are constrained by
6          what § 1350 shows on its face: *no limitations as to the citizenship*
           *of the defendant, or the locus of the injury*."  Id. at 500.
7

8  Sarei v. Rio Tinto, PLC, 671 F.3d 736, 744-45 (9th Cir. 2011) (en banc) (emphasis added).[8]  The

9  court noted that "[a]lthough the torts alleged all occurred outside of the United States, Rio Tinto

10  has substantial operations in this country," and went on to hold that "[t]here is no extraterritorial

11  bar to applying the ATS to the conduct alleged in this case."  Id. at 747.

12          The Supreme Court vacated the decision in Sarei, and remanded "for further consideration

13  in light of Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013)."  Rio Tinto, PLC v.

14  Sarei, 133 S. Ct. 1995 (2013).  On remand, the Ninth Circuit "voted to affirm the district court's

15  judgment of dismissal with prejudice."  Sarei v. Rio Tinto, PLC, 722 F.3d 1109, 1110 (9th Cir.

16  2013) (en banc).  Thus, it is even more difficult to view Marcos as stating the applicable law

17  regarding the extraterritorial reach of the Act, where, as here, there is "no nexus" of any kind to

18  the United States.

19          In light of Kiobel, Doe I, and Sarei, the complaint fails to establish that this court can

20  exercise jurisdiction over this case, since it alleges *no conduct* that could be said to "touch and

21  concern" the United States, no matter how that phrase is interpreted, and even if it is assumed that

22  Marcos is still good law.[9]  The remaining cases cited by plaintiff also predate Kiobel, Doe I and

23  Sarei, and in addition, some or all involve cases were there was *some* connection to the United

24  States.  See, e.g., Doe v. Saravia, 348 F. Supp. 2d 1112, 1118 (E.D. Cal. 2004) ("*Saravia was*

25  _____

26  [8]  Vacated, 133 S. Ct. 1995 (2013).
    [9]  The undersigned expresses no view on whether Marcos would be decided the same way today,
    given that there was, in fact, a critical nexus to this country in that case, namely, the defendant
27  had fled to this country.  However, Marcos does not mention this nexus in reaching its conclusion
    that the ATS reached conduct occurring entirely in the Philippines.

28

1    *resident in Modesto, California*, in the Fresno Division of the Eastern Judicial District of

2    California at the time this suit was filed") (emphasis added); <u>Letelier v. Republic of Chile</u>, 502 F.

3    Supp. 259, 260 (D.D.C. 1980) (a case involving "the bombing deaths of former Chilean

4    ambassador Letelier and Ronni Moffitt in September 1976 *in Washington, D.C.*") (emphasis

5    added); <u>Filartiga v. Pena-Irala</u>, 577 F. Supp. 860 (E.D.N.Y. 1984) (involving a lawsuit brought by

6    plaintiffs "who had applied for permanent political asylum in the United States," against a

7    defendant "*who was in United States on a visitor's visa*") (emphasis added).

8         At oral argument, plaintiff's counsel asserted for the first time that all the conduct alleged

9    in the complaint occurred because of the breach of an "oral treaty," and that this breach occurred

10   in the United States.[10]  According to counsel, an unidentified President of the United States (since

11   identified in a post-hearing submission as Dwight D. Eisenhower, <u>see</u> ECF No. 28 at 2), entered

12   into an "oral treaty" with the "King of Laos."  Under this treaty, the Hmong people would assist

13   the United States in fighting the Pathet Lao, and the United States would protect the Hmong after

14   the war.  However, counsel asserted, the United States had no intention of honoring the treaty,

15   even at the moment that agreement was reached.  In addition, according to counsel, the United

16   States left behind weapons that were then used by Laos in the atrocities against the Hmong

17   people.  It is not at all clear that such allegations, even if they appeared in the complaint, would

18   suffice to allow this court to exercise jurisdiction over this case.  However, since these allegations

19   do not even appear in the complaint, they cannot be used to justify the entry of a default

20   judgment.

21        Plaintiff has now submitted two Requests for Leave to file further statements and

22   evidence, totaling over 580 pages,[11] in a belated attempt to show that the claim has some

23   connection to the United States.  <u>See</u> ECF Nos. 28, 29.  As noted above, even if the submitted

24

25   [10]  Counsel did not explain what an "oral treaty" is, or whether it is the type of "treaty" that is referred to in the ATS.

26   [11]  The exhibits consist of the following unauthenticated and unexplained documents: newspaper

27   articles; pages from treaties, conventions, agreements and resolutions; Congressional testimony; photographs; reports on gold reserves; investor forms; analyses of financial statistics; graphs; Laotian military orders; maps; and foreign language documents.

28

1   documents and additional statements would show that the claims are sufficiently connected to the

2   United States, no default judgment is warranted at this time because none of this information is in

3   the complaint.  Under <u>Eitel</u>, the court looks exclusively to the sufficiency of the *complaint*.  <u>See</u>

4   <u>also</u> <u>Cripps v. Life Ins. Co. of North America</u>, 980 F.2d 1261, 1267 (9th Cir. 1992) ("necessary

5   facts not contained in the pleadings . . . are not established by default.").  It is well established

6   that "[a] plaintiff suing in federal court must show *in his pleading*, affirmatively and distinctly,

7   the existence of whatever is essential to federal jurisdiction [. . .]." <u>Smith v. McCullough</u>, 270

8   U.S. 456, 459 (1926) (emphasis added).  This court is not called upon to pore through hundreds of

9   pages of documents submitted after it becomes clear that the *complaint* is insufficient to state a

10   claim or establish federal jurisdiction.

11         In summary, the complaint does not support default judgment against any defendant.

12   Indeed, <u>Kiobel</u> compels the conclusion that the court cannot exercise jurisdiction over this

13   lawsuit.  That is sufficient grounds for the court to issue an order to show cause why the entire

14   case should not be dismissed for lack of federal jurisdiction, but with leave to amend.

15         Since there is no federal jurisdiction over this case as currently pled, the analysis would

16   normally end here.  However, the jurisdictional issue discussed above can possibly be fixed by

17   amendment of the complaint, if plaintiff can truthfully allege facts showing that the conduct

18   alleged has a sufficient nexus to the United States.  Accordingly, the undersigned considers the

19   immunity issues raised by the Foreign Sovereign Immunity Act, and the Suggestion of Immunity

20   filed by the United States, as they are equally jurisdictional in nature.[12]

21              2.   <u>Immunity</u>

22                a. <u>People's Democratic Republic of Laos</u>

23         A foreign state is immune from suit except as specified in the Foreign Sovereign

24   Immunity Act ("FSIA").  28 U.S.C. § 1604 ("a foreign state shall be immune from the

25   _____

26   [12] "A court has a duty to assure itself of its own jurisdiction, regardless of whether jurisdiction is
     contested by the parties.  Therefore, even if the foreign state does not enter an appearance to
     assert an immunity defense, a District Court still must determine that immunity is unavailable."

27   <u>Peterson v. Islamic Republic Of Iran</u>, 627 F.3d 1117, 1125 (9th Cir. 2010) (citation and internal
     quotations marks omitted).

28

1    jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607 of

2    this chapter); Cassirer v. Kingdom of Spain, 616 F.3d 1019, 1026-27 (9th Cir. 2010), cert. denied,

3    131 S. Ct. 3057 (2011).  Indeed, the FSIA is "the sole basis for obtaining jurisdiction over a

4    foreign state in our courts."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428,

5    434 (1989).  Moreover, "the FSIA 'must be applied by the district courts in every action against a

6    foreign  sovereign, since subject-matter jurisdiction in any such action depends on the existence

7    of one of the specified exceptions to foreign sovereign immunity.'"  Amerada Hess, 488 U.S. at

8    434-35 (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480 (1983)).

9              The exceptions to this jurisdictional immunity are,

10                 [1]cases involving the waiver of immunity, [2] commercial
                   activities occurring in the United States or causing a direct effect in
11                 this country, [3] property expropriated in violation of international
                   law, [4] inherited, gift, or immovable property located in the United
12
                   States, [5] non-commercial torts occurring in the United States, and
13                 [6] maritime liens.

14   Amerada Hess, 488 U.S. at 439 (citations omitted, citing 28 U.S.C. § 1605(a), (b)).

15             None of the above exceptions to the FSIA are alleged in the complaint, none were asserted

16   in the motion for default judgment, and none were mentioned at the hearing on this matter.

17   Accordingly, the court lacks the authority to enter a default judgment here.  Indeed, since the

18   immunity is jurisdictional, the court cannot even exercise jurisdiction over the claim against Laos.

19   That is sufficient grounds for the issuance of an order to show cause why the claim against Laos

20   should not be dismissed for lack of jurisdiction.

21                          b.  The President and Prime Minister of Laos

22             The United States has filed a "Suggestion of Immunity" in this case on behalf of the

23   President and Prime Minister of Laos.  ECF No. 23; see 28 U.S.C. § 517 ("any officer of the

24   Department of Justice, may be sent by the Attorney General to any State or district in the United

25   States to attend to the interests of the United States in a suit pending in a court of the United

26   States").  The government asserts that federal courts are required to defer to this Suggestion, and

27   that the court therefore must find that the President and Prime Minister are immune from suit.

28   ECF No. 23 at 4-10.  Plaintiff, ignoring the distinction between a "Suggestion of Immunity" by

13

1  the United States, and a "claim of immunity" by a defendant, argues that "claims for immunity

2  simply do not apply to a war crimes case such as the present one."  See ECF No. 24 at 3-11.

3      Before the enactment of the FSIA:

4      [T]he State Department could file a formal suggestion of immunity
       with the court on behalf of the foreign state.  If the request was
5      granted, the district court dismissed the case for lack of jurisdiction.

6  Peterson v. Islamic Republic Of Iran, 627 F.3d 1117, 1126 (9th Cir. 2010).  This changed with the

7  enactment of the FSIA, in which Congress granted the federal courts the authority to decide

8  immunity claims made by foreign states.  28 U.S.C. § 1602 ("[c]laims of foreign states to

9  immunity should henceforth be decided by courts of the United States and of the States in

10  conformity with the principles set forth in this chapter").

11      "After the enactment of the FSIA, the Act – and not the pre-existing common law –

12  indisputably governs the determination of whether a foreign state is entitled to sovereign

13  immunity."  Samantar v. Yousuf, 560 U.S. 305, 313 (2010).  The question before the Court in

14  Samantar, however, was whether the FSIA applied to claims of immunity made by foreign

15  government officials, the Prime Minister in that case.  The answer was "no."

16      The narrow question we must decide is whether the Foreign
       Sovereign Immunities Act of 1976 (FSIA or Act), 28 U.S.C.
17      §§ 1330, 1602 et seq., provides petitioner with immunity from suit
       based on actions taken in his official capacity.  We hold that the
18      FSIA does not govern the determination of petitioner's immunity
       from suit.
19

20  Id. at 308.[13]  Since the FSIA does not govern immunity of a foreign government official, the court

21  looks to the pre-FSIA practice, in which the State Department determined individual official

22  immunity for foreign officials.  Id. at 323 ("[w]e have been given no reason to believe that

23  Congress saw as a problem, or wanted to eliminate, the State Department's role in determinations

24  regarding individual official immunity").

25      Under that practice, the federal courts defer to the government's Suggestion of Immunity,

26  _____

27  [13]  Samantar thus abrogated Chuidian v. Philippine Nat. Bank, 912 F.2d 1095 (9th Cir. 1990),
    which had held that plaintiff's suit against a foreign government official "for acts committed in
    his official capacity . . . must be analyzed under the framework of the Act [FSIA]."

28

1   without any further inquiry.  See Manoharan v. Rajapaksa, 711 F.3d 178, 180 (D.C. Cir. 2013)

2   (per curiam) (court dismissed Torture Victim Protection Act claim against the sitting President of

3   Sri Lanka, "as a consequence of the State Department's suggestion of immunity"); Tachiona v.

4   Mugabe, 169 F. Supp. 2d 259, 296-97 (S.D.N.Y. 2001) (in dismissing a suit against the president

5   and foreign minister of Zimbabwe based on a suggestion of immunity filed by the Executive

6   Branch, the court states "[a]ccordingly, the Court concludes that, contrary to Plaintiffs' argument,

7   the FSIA does not serve to abrogate the State Department's decisive role in the recognition of

8   head-of-state immunity, nor to negate the head-of-state immunity invoked here by the State

9   Department on behalf of Mugabe and Mudenge"), aff'd in pertinent part, 386 F.3d 205 (2d Cir.

10   2004), cert. denied, 547 U.S. 1143 (2006);[14] Alicog v. Kingdom of Saudi Arabia, 860 F. Supp.

11   379, 382 (S.D. Tex. 1994) (because the United States filed a Suggestion of Immunity – see ECF

12   No. 23, 4:93-cv-4169 (S.D. Tex.) –  the case must be dismissed against the King of Saudi

13   Arabia), aff'd mem., 79 F.3d 1145 (5th Cir. 1996); Wei Ye v. Jiang Zemin, 383 F.3d 620, 625

14   (7th Cir. 2004) ("[t]he obligation of the Judicial Branch is clear – a determination by the

15   Executive Branch that a foreign head of state is immune from suit is conclusive and a court must

16   accept such a determination without reference to the underlying claims of a plaintiff"), cert.

17   denied, 544 U.S. 975 ((2005); Habyarimana v. Kagame, 696 F.3d 1029, 1032 (10th Cir. 2012)

18   ("[w]e must accept the United States' suggestion that a foreign head of state is immune from suit

19   . . . as a conclusive determination by the political arm of the Government that the continued

20   [exercise of jurisdiction] interferes with the proper conduct of our foreign relations") (internal

21   quotation marks omitted), cert. denied, 133 S. Ct. 1607 (2013).[15]

22

---

23   [14]  Although the Second Circuit affirmed the district court's dismissal of Mugabe and Mudenge, it
       did so on grounds of "diplomatic immunity," and had "no occasion to decide whether Mugabe

24   and Mudenge were protected from suit by head-of-state immunity – whether under the terms of
       the FSIA or because of the Government's suggestion of immunity."  Tachiona v. United States,

25   386 F.3d 205, 221 (2d Cir. 2004), cert. denied, 547 U.S. 1143 (2006).
       [15]  See also, Estate of Domingo v. Republic of Philippines, 808 F.2d 1349, 1350 (9th Cir. 1987)

26   (noting without comment, that the district court "dismissed the action against Marcos with
       prejudice" upon receiving a Suggestion of Immunity from the State Department).  It appears that

27   the Ninth Circuit has not ruled directly on this point.  However the undersigned is aware of no
       circuit case that holds contrary to the cited cases from the D.C., 2nd, 5th, 7th and 10th Circuits.

28

1    Plaintiff argues that "claims of immunity" do not lie when war crimes are alleged.  This

2   argument ignores the distinction between a Suggestion of Immunity, which is made by the United

3   States, and a claim of immunity, which is made by a defendant.  The distinction is critical,

4   because in the cases cited by plaintiff, the claims of immunity were examined by the court on the

5   merits of the immunity claim, whereas, as discussed above, a Suggestion of Immunity is entitled

6   to deference without any examination of the merits of the immunity claim.[16]

7    Indeed, only one case that plaintiff cites in support of its argument actually involved a

8   Suggestion of Immunity, and in that case, the court honored the Suggestion, dismissing all the

9   claims against the sitting President and Foreign Minister of Zimbabwe.  See Tachiona ex rel.

10   Tachiona v. Mugabe, 186 F. Supp. 2d 383, 384 (S.D.N.Y. 2002) ("this Court honored a

11   'Suggestion of Immunity' . . . [and] [o]n this basis . . . dismissed claims . . . of torture, terrorism,

12   summary executions and related violations of international law allegedly committed by these

13   officials and other defendants").  The remaining cases plaintiff cites in support of its argument all

14   involved former heads of state or government, for whom the United States did not submit a

15   Suggestion of Immunity.  See Marcos (no Suggestion of Immunity involved in this case against

16   the daughter of the former President of the Philippines); Hilao v. Marcos (In re Estate of

17   Ferdinand Marcos, Human Rights Litig.), 25 F.3d 1467 (9th Cir. 1994) (no Suggestion of

18   Immunity involved in this case against the former President of the Philippines), cert. denied, 513

19   U.S. 1126 (1995); Enahoro v. Abubakar, 408 F.3d 877 (7th Cir. 2005) (no Suggestion of

20   Immunity involved in this case against the former Nigerian head of state), cert. denied, 546 U.S.

21   1175 (2006); cf. Domingo, 808 F.2d at 1350 (Suggestion of Immunity was submitted in a lawsuit

22   against Ferdinand Marcos, then the sitting President of The Philippines, but no such Suggestion

23

---

24   [16]  Moreover, in the cases cited by plaintiff in support of this argument, the United States has
submitted a Suggestion of Immunity only in cases involving sitting high-ranking government

25   officials.  In the cases involving other officials, or *former* high-ranking officials, no Suggestion of
Immunity was filed.  Thus, even if plaintiff is correct that the courts may reject a "claim of

26   immunity" *made by the defendant* when war crimes are involved, she fails to show that that
argument has any application to a situation where the United States has filed a Suggestion of

27   Immunity on behalf of a sitting head of state or head of government.

28

1   was submitted on behalf of Marcos in a lawsuit filed after he left office).

2          This court is required to defer to the Suggestion of Immunity filed the United States in this

3   matter.  Accordingly, the sitting President and Prime Minister of Laos are immune from this suit,

4   warranting an Order To Show Cause why the action against them should not be dismissed with

5   prejudice.

6                                        IV.  CONCLUSION

7          For the reasons stated above, IT IS HEREBY ORDERED that

8          1.  The Order and Findings and Recommendations of March 14, 2016 (ECF No. 30), are

9   VACATED; and

10          2.  Plaintiff's Requests for Leave To File additional materials (ECF Nos. 28, 29) are

11   DENIED.

12          Furthermore, IT IS HEREBY RECOMMENDED that:

13          1.  Plaintiff's motion for default judgment (ECF No. 19), should be DENIED in its

14   entirety;

15          2.  Plaintiff should be Ordered to Show Cause why the lawsuit against the sitting President

16   and Prime Minister of Laos should not be dismissed with prejudice based upon the Suggestion of

17   Immunity; and

18          3.  Plaintiff should be Ordered To Show Cause why the remainder of this lawsuit should

19   not be dismissed for lack of federal jurisdiction.

20          These findings and recommendations are submitted to the United States District Judge

21   assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one (21)

22   days after being served with these findings and recommendations, plaintiff and the United States

23   may file written objections with the court.  Such document should be captioned "Objections to

24   Magistrate Judge's Findings and Recommendations."  Local Rule 304(d).  The parties are advised

25   ////

26   ////

27   ////

28   ////

                                              17

that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 17, 2016

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE